# United States Court of Appeals for the Federal Circuit

---

**BUREAU NATIONAL INTERPROFESSIONNEL DU COGNAC, INSTITUT NATIONAL DES APPELLATIONS D'ORIGINE,**
*Appellants*

**v.**

**COLOGNE & COGNAC ENTERTAINMENT,**
*Appellee*

---

2023-1100

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 91250532.

---

Decided: August 6, 2024

---

PETER M. BRODY, Ropes & Gray LLP, Washington, DC, argued for appellants. Also represented by NICOLE S.L. POBRE, KATHRYN C. THORNTON.

JAMES KLOBUCAR, Gearhart Law, LLC, Summit, NJ, argued for appellee. Also represented by RICHARD I. GEARHART.

M. PATRICK YINGLING, Reed Smith LLP, Chicago, IL, for amici curiae Colombian Coffee Growers Federation, Confederation Generale Des Producteurs De Lait De

Brebis Et Des Industriels De Roquefort, Consejo Regulador del Tequila, A.C., Consorzio del Prosciutto di Parma, Distilled Spirits Council of the United States, Inc., Federation of the Swiss Watch Industry FH, Irish Whiskey Association, Kentucky Distillers Association, Napa Valley Vintners, Organization for an International Geographical Indications Network, Scotch Whisky Association. Also represented by JILLIAN L. BURSTEIN; TED A. HAGES, Pittsburgh, PA.

————————————

Before LOURIE, CLEVENGER, and HUGHES, *Circuit Judges.*

LOURIE, *Circuit Judge.*

Bureau National Interprofessionnel du Cognac, the interprofessional union of all growers, producers, and merchants of COGNAC spirits, and Institut National des Appellations d'Origine, an administrative agency within the French government (collectively, "Opposers"), are the entities responsible for controlling and protecting the certification mark COGNAC. Opposers filed an opposition to a trademark application for COLOGNE & COGNAC ENTERTAINMENT and corresponding design mark by Cologne & Cognac Entertainment ("Applicant"), a hip-hop record label. The United States Patent and Trademark Office ("PTO") Trademark Trial and Appeal Board ("the Board") dismissed the opposition to the challenged mark, holding that the mark, if used for hip-hop music and production services, was not likely to cause confusion under 15 U.S.C. § 1052(d) or dilution under 15 U.S.C. § 1125(c) to the COGNAC certification mark. *Bureau Nat'l Interprofessionnel du Cognac v. Cologne & Cognac Entm't*, 2022 WL 3755301 (T.T.A.B. Aug. 25, 2022) ("*Decision*" or "*Dissent*," as appropriate). For the following reasons, we vacate and remand.

## BACKGROUND

Unlike trademarks, which indicate a single source of a product or service, certification marks are used by a person

other than its owner with authorization from the owner. 15 U.S.C. §§ 1127(1), 1064(5). They generally "certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization." 15 U.S.C. § 1127; *see also* TMEP 1306.05(j) (showing examples). To that end, certification marks are expressly exempted marks of regional origin from the Lanham Act's general rule precluding "primarily geographically descriptive" marks. 15 U.S.C. § 1052(e) (explaining that marks for goods may not be "primarily geographically descriptive of them, except as indications of regional origin may be registerable under section 1054 of this title"). Pursuant to 15 U.S.C. § 1054, "certification marks, including indications of regional origin, shall be registerable . . . in the same manner and with the same effect as are trademarks." Certification marks are therefore entitled to the same protections as trademarks. *See Institut Nat'l des Appellations d'Origine v. Brown-Forman Corp.*, 47 U.S.P.Q.2d (BNA) 1875, 1891 (T.T.A.B. 1998) ("*Brown-Forman*") (rejecting an applicant's argument that COGNAC "is entitled to a more narrow scope of protection merely because it is a certification mark rather than a trademark").

Opposers are responsible for controlling and protecting the common law certification mark COGNAC for brandy manufactured in the Cognac region of France according to certain standards. The United States Alcohol and Tobacco Tax and Trade Bureau, the federal agency charged with regulating the labeling and advertising of spirits products in the United States, prohibits use of the term "COGNAC" on spirits products except for "[g]rape brandy distilled exclusively in the Cognac region of France, which is entitled to be so designated by the laws and regulations of the French Government." 27 C.F.R. § 5.145(c)(2). Although COGNAC is not registered with the PTO, it is undisputed that it is a common law certification mark. *See Brown-Forman*, 47 U.S.P.Q.2d (BNA) at 1885 ("COGNAC is not a

generic term, but rather a valid common law regional certification mark."); *Decision* at \*5 (finding that Applicant did not dispute the evidence "regarding the history of the Cognac certification mark or contest that Opposers have been certifying Cognac destined for the U.S."). As long as a common law certification mark has been shown to have been in use prior to the date of a junior mark and not abandoned, it is entitled to the same level of protection against likelihood of confusion and dilution as a registered mark. *See* 15 U.S.C. §§ 1052(d), 1125(c) (referring to "marks" without specifying that they be "registered"); *see also JBLU, Inc. v. United States*, 813 F.3d 1377, 1381 (Fed. Cir. 2016) ("[T]rademark rights stem from use, not registration."); *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1383 (Fed. Cir. 2002) ("Unregistered marks receive essentially the same protection as registered marks[.]"); *Decision* at \*2 ("[A]n opposer may rely upon prior common law rights in an unregistered certification mark.").

Applicant seeks registration on the Principal Register of the composite mark depicted below (with "Entertainment" disclaimed):



for

> Audio and video recordings featuring music and artistic performances; compact discs featuring music; digital materials, namely, CDs and downloadable digital audio recordings featuring music; digital music downloadable from the internet; downloadable video recordings featuring music; musical sound recordings; musical video recordings

in International Class 9; and

> Music composition services; production of musical videos; entertainment in the nature of live performances by musical artists; entertainment information services, namely, providing information and news releases about a musical artist; entertainment services by a musical artist and producer, namely, musical composition for others and production of musical sound recordings; entertainment services, namely, non-downloadable prerecorded music and graphics presented to mobile communications devices via a global computer network and wireless networks; entertainment services, namely, providing non-downloadable prerecorded music, information in the field of music, and commentary and articles about music, all online via a global computer network; film and video film production; providing a website featuring non-downloadable videos in the field of music; record master production

in International Class 41. *Decision* at *1 (quoting U.S. Trademark App. 88/329,690 (filed Mar. 7, 2019)).

Opposers filed an opposition to the registration of Applicant's mark, claiming priority as well as (1) likelihood of confusion with the COGNAC certification mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d); and (2) that Applicant's mark, by creating an association with the COGNAC mark, would be likely to cause dilution through blurring under Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c). Applicant denied the salient allegations and asserted various defenses, including that Opposers failed to state a claim upon which relief could be granted. *Decision* at *1–2. However, the Board found that Applicant ultimately waived that defense by not filing a motion to dismiss or raising the issue at trial. *Id.* at *2 n.4.

In a split decision, the Board dismissed the opposition to the challenged mark, holding that the mark, if used for

hip-hop music and production services, was not likely to cause confusion under 15 U.S.C. § 1052(d). The majority found that all relevant factors set forth in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) ("*DuPont*"), either weighed against a likelihood of confusion or were neutral. *Decision* at *6–15. Specifically, it found that the COGNAC mark is not strong or famous; that Applicant's mark has a different "connotation" from that of COGNAC and thus is dissimilar; and that the relevant goods, services, trade channels, and purchasers do not overlap. *Id.* It found the consumer sophistication, actual confusion, and bad faith factors to be neutral, *id.* at *14–15, and did not address the other factors, *id.* at *6 (explaining that it considered only the *DuPont* factors "for which there is evidence and argument of record"). The majority therefore held that, on balance, confusion was unlikely. *Id.* at *15.

Regarding dilution under 15 U.S.C. § 1125(c), despite Applicant's waiver, the Board ruled that Opposers' pleading was defective because it did not include a specific allegation that the fame of COGNAC predated Applicant's constructive use date, and further ruled that whether or not COGNAC's fame predated Applicant's use was not tried by implied consent. *Decision* at *15–16. The majority ruled that, in the alternative, Opposers had not proven the fame element of dilution, relying on its analysis of fame for purposes of likelihood of confusion. *Id.* at *16.

Administrative Trademark Judge ("ATJ") Wolfson dissented from the majority's dismissal of the likelihood of confusion claim, asserting that "the majority incorrectly analyzes the first, second and third *DuPont* factors and fails to accord proper weight to the fifth and thirteenth factors." *Dissent* at *17 (Wolfson, ATJ, concurring-in-part, dissenting-in-part). ATJ Wolfson found that those errors "[led] the majority to find incorrectly that confusion of consumers is unlikely." *Id.* ATJ Wolfson concurred that dilution was not properly pleaded or tried by implied consent, but opined that "given the fame of the mark and the degree

of association with it that Applicant's mark engenders," it is "highly likely that Opposers would succeed in their dilution by blurring claim" if it had been pleaded and tried. *Id.* at \*17 n.55.

Opposers timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B) and 15 U.S.C. § 1071(a)(1).

## DISCUSSION

### I. LIKELIHOOD OF CONFUSION

Likelihood of confusion is a question of law based on underlying factual findings. *Stone Lion Cap. Partners, L.P. v. Lion Cap. LLP*, 746 F.3d 1317, 1321 (Fed. Cir. 2014). We review the Board's ultimate legal conclusion *de novo*, *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1365 (Fed. Cir. 1999), and its underlying findings of fact for substantial evidence, *On-Line Careline Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000). Whether or not a likelihood of confusion exists is determined using the factors set out in *DuPont*:

(1) The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

(2) The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use.

(3) The similarity or dissimilarity of established, likely-to-continue trade channels.

(4) The conditions under which and buyers to whom sales are made, *i.e.*, "impulse" vs. careful, sophisticated purchasing.

(5) The fame of the prior mark (sales, advertising, length of use).

(6) The number and nature of similar marks in use on similar goods.

8      BUREAU NATIONAL INTERPROFESSIONNEL DU COGNAC v.
COLOGNE & COGNAC ENTERTAINMENT

(7) The nature and extent of any actual confusion.

(8) The length of time during and conditions under which there has been concurrent use without evidence of actual confusion.

(9) The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark).

(10) The market interface between applicant and the owner of a prior mark . . . .

(11) The extent to which applicant has a right to exclude others from use of its mark on its goods.

(12) The extent of potential confusion, *i.e.*, whether de minimis or substantial.

(13) Any other established fact probative of the effect of use.

*DuPont*, 476 F.2d at 1361.

Not all the *DuPont* factors are necessarily "relevant or of equal weight in a given case, and any one of the factors may control a particular case." *In re Majestic Distilling Co.*, 315 F.3d 1311, 1315 (Fed. Cir. 2003) (internal quotation marks omitted). However, we have consistently held that the fame of a prior mark, when present, is a "dominant" consideration in the balancing the *DuPont* factors and the likelihood of confusion analysis. *Recot, Inc. v. Becton*, 214 F.3d 1322, 1327–28 (Fed. Cir. 2000). "Famous marks are accorded more protection precisely because they are more likely to be remembered and associated in the public mind than a weaker mark." *Id.* at 1327 (citing *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 352 (Fed. Cir. 1992)).

Opposers argue (A) that the Board applied the incorrect legal standard for fame and that its finding that the COGNAC mark is not famous was not supported by substantial evidence, (B) that the Board legally erred in analyzing the similarity of the parties' marks and that its allegedly inconsistent findings show that its conclusion on

similarity was not supported by substantial evidence, and (C) that the Board applied the wrong legal standard in evaluating the relatedness of goods, trade channels, and consumers. We agree and address each argument in turn.

## A. FAME OF SENIOR MARK

We first consider the fifth *DuPont* factor. That factor pertains to "[t]he fame of the prior mark (sales, advertising, length of use)." *DuPont*, 476 F.2d at 1361. In a likelihood of confusion analysis, the fame or strength of a mark is not a binary factor, but rather varies along a spectrum from very strong to very weak. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 1325 (Fed. Cir. 2017). Where on that spectrum a mark falls impacts its scope of protection. "A famous mark is one 'with extensive public recognition and renown.'" *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1371 (Fed. Cir. 2002) (quoting *Kenner Parker Toys*, 963 F.2d at 353). Fame is a "dominant" factor in a likelihood of confusion analysis because famous marks are afforded a broad scope of protection. *Recot*, 214 F.3d at 1327–28.

The majority seems to have required that COGNAC be famous for its "certification status," rather than its geographic significance or other indicator(s) (*e.g.*, quality, method of manufacture, etc.). *See, e.g.*, *Decision* at \*9 (explaining that the mark was used "in a manner that is not likely to heighten consumer awareness to the certification status of the term COGNAC"); *id.* at \*10 (finding that Opposers failed to show that the "COGNAC mark is a strong one in terms of renown for conveying the message that the goods are certified by Opposers"); *id.* (discussing the difficulties in "measuring the level of consumer awareness for the goods' certification status"). We find that to be error. A certification mark may be famous for "regional or other origin, material, mode of manufacture, quality, accuracy, *or* other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization," 15 U.S.C. § 1127 (emphasis added), but it need not be

famous for all of its indications, and it need not be famous for its certification function.

In *Brown-Forman*, a Board decision that the Director of the PTO has deemed precedential, the Board granted summary judgment that "as a matter of law, . . . COGNAC is a common law regional certification mark." 47 U.S.P.Q.2d (BNA) at 1884. In the process of reaching that determination, the Board found that "the issue is not whether the public is expressly aware of the certification function of the mark or the certification process underlying use of the mark, but rather is whether the public understands that goods bearing the mark come only from the region named in the mark." *Id.* It further held that, for the mark to be a certification mark, "[n]either the statute nor the caselaw requires that purchasers also be expressly aware of the term's certification function, per se." *Id.*; *see also Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 U.S.P.Q.2d (BNA) 1477, 1483 (T.T.A.B. 2017) (similar); *Tea Bd. of India v. Republic of Tea, Inc.*, 80 U.S.P.Q.2d (BNA) 1881, 1887 (T.T.A.B. 2006) (similar); TMEP § 1306.05(c). We agree and conclude that the same rationale applies to determining the fame of the mark. Not only is there no statutory requirement that consumers be aware of the "certification status" of the mark,[1] but such a requirement could be impractical and inconsistent with ordinary purchasing behaviors.

In this case, Opposers argued that the COGNAC mark was a famous designator of regional origin. The Board should therefore have considered whether or not the mark was famous as an indicator of its geographic origin, but it

---

[1]    Indeed, Applicant's counsel agreed that consumers' knowledge of the certification process is not necessary for fame and that if the Board required such a showing, then it legally erred. Oral Arg. at 23:56–24:32, *available at* https://oralarguments.cafc.uscourts.gov/default.aspx?fl=23-1100_06042024.mp3.

did not do so. That failure alone is an error necessitating vacatur and remand.

The Board also seemed to hold that substantial sales and advertising of certified COGNAC products could not establish the fame of the certification mark because those products also prominently bear brand or house names (*e.g.*, HENNESSEY). *See Decision* at *8–10 ("Unless there is evidence to the contrary, there is the assumption that the [house] mark has made an impression on the consumer based on the volume of sales and advertising of the goods or services under that mark."); Oral Arg. at 25:53–28:20 (Applicant's counsel agreeing that the Board applied a presumption that any fame of products was from the house mark, rather than the certification mark). That cannot be the case. Certification marks are often present *with* a house or brand name mark because they can *only* be used on third-party products. 15 U.S.C. §§ 1127(1), 1064(5). The fame of a house mark therefore cannot, per se, preclude a finding of fame of a certification mark that appears on the same product. Nor is there a presumption that the fame of a product is the result of the house mark over the certification mark. Indeed, some products may be *more* famous for their regional origin, as indicated by their certification mark, than for their brand name, *e.g.*, FLORIDA oranges, DARJEELING tea, and GEORGIA peaches. And, as the Board acknowledged, it is possible that consumers "will ask for 'a Cognac,' without specifying a brand, or they may ask what 'Cognac' brands are available." *Decision* at *8. That a brand name, *e.g.*, HENNESSEY, may be famous does not mean the certification mark cannot also be famous. It is not an either/or situation.[2] *See Bose*, 293 F.3d at 1374–76 (finding that product marks, ACOUSTIC

---

² Although the Board acknowledged that "this is not an 'either . . . or' proposition," its analysis belies that assertion. *Decision* at *8.

WAVE and WAVE, were famous in addition to their house mark, BOSE).

The issue of how to address sales and advertising expenditures as evidence of fame for certification marks that are accompanied by house or product marks is an issue of first impression for this court. However, we have addressed a similar issue in *Bose*: analyzing fame for product marks that travel with famous house marks. *Id.* at 1374. In that case, we concluded that "those who claim fame for product marks that are used in tandem with a famous house mark can properly be put to tests to assure their entitlement to the benefits of fame for the product marks" such that the product mark must be shown to have "independent trademark significance." *Id.*

Finding that the Board incorrectly rejected sales and advertising expenditure evidence as not indicative of the fame of the product mark, we reasoned in *Bose* that that evidence should be "seen both in the context of how the products are presented in advertising and sales materials . . . and in the context of the continuous and extensive critical consideration the marketed products have enjoyed." *Id.* at 1375. We found that, since the record provided "evidence that the consuming public has been exposed frequently and nationwide to extensive descriptions of the two products," the commercial evidence supported a finding that the product mark was famous even though it accompanied a famous house mark. *Id.* at 1376. We find the reasoning in *Bose* to be relevant and applicable to the present case.

Here the Board correctly noted that "[i]n evaluating the relevance of the number of sales of certified goods or services, as well as the extent of advertising and its effect on consumers, we must look to what impression is being made on the consuming public." *Decision* at *8. But it then simply stated that it was "difficult to determine what is driving the significant sales from the perspective of the consumers" and found that "Opposers' evidence does not provide sufficient support for an unequivocal conclusion

that their COGNAC mark is a strong one in terms of renown for conveying the message that the goods are certified by Opposers as to regional origin and meeting the prescribed qualities." *Id.* at \*8, \*10.  In support, the Board pointed out that COGNAC is often used "inconspicuously" on the products it appears. *Id.* at \*9.  But that is frequently the case for certification marks.  Indeed, as the PTO has recognized, certification marks, by their nature, "may appear in an inconspicuous fashion." TMEP § 1306.05(b)(iii). Their prominence, or lack thereof, should therefore not be determinative of fame.  Thus, it was legal error for the Board to require "unequivocal" evidence that the volume of sales was driven by the COGNAC mark to rebut the presumption it applied that the commercial evidence was attributable to the house mark alone.

Instead, the Board should have determined, based on the context-specific evidence, whether a portion of the sales and advertising evidence could be attributed to the COGNAC mark such that that evidence was indicative of fame for the certification mark.  The Board noted, but failed to properly credit, evidence that "[t]he news and industry articles of record . . . reflect the renown of the brandy from France, and that it has been featured and is particularly popular within the hip hop music industry" and that Cognac has "success as a spirit." *Id.* at \*10.  Indicia of critical attention and the general reputation of a marked product are the exact types of evidence that we found in *Bose* that the Board erroneously overlooked in determining that the sales and advertising numbers did not support a finding of fame. *Bose*, 293 F.3d at 1375–76.

Most notably, each piece of evidence the Board highlighted to show that the mark is *not* famous, due to its allegedly diminished placement, would appear to show the opposite, consistently and frequently using the term COGNAC, irrespective of and sometimes without reference to a house or brand name. *See*, *e.g.*, *Decision* at \*9 (reproducing images of bottles and excerpting news articles, advertisements, and cocktail recipes that all mention

COGNAC)[3]; *see also Bose*, 293 F.3d at 1374 ("[C]onsumer awareness of the product mark apart from the fame of the associated house mark, whether demonstrated directly or indirectly, is a reliable test of the independence of the product mark from its parent house mark."). The Board needed to consider whether or not the COGNAC certification mark was famous, independent of the brand or house marks it often appears with, yet it failed to do so. That was legal error.

In addition to, or perhaps because of, the Board's legal errors, its factual findings regarding fame were inconsistent. In one breath, it concluded that "the evidence of record shows that Cognac . . . is a popular spirit in the United States, with impressive sales in terms of both the number of products sold and overall dollar value of those sales," the record "reflect[s] the renown of the brandy from France," COGNAC "is particularly popular within the hip hop music industry," and it has "success as a spirit." *Decision* at \*10. Yet despite those factual findings, the Board puzzlingly concluded that the mark is not famous at all and merely "distinctive and entitled to a normal scope of protection." *Id.* Those inconsistencies rise to the level that, even were there not legal errors, the Board's finding that COGNAC is not famous was not supported by substantial evidence. *See Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (finding the Patent Trial and Appeal Board's analysis flawed due to internal inconsistencies); *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1064 (Fed. Cir. 2009) (finding that an International Trade Commission decision

---

[3]    That those articles, recipes, and products frequently use a lowercase "c" is of no consequence. *See Decision* at \*9. Although lack of capitalization may be relevant in determining whether or not a mark has become generic, which is not at issue here, it is not relevant to whether or not a mark is famous.

that was "internally inconsistent" was "not supported by substantial evidence").

Notably, although its decision is not binding, a different panel of the Board, with a similar record before it, reached the opposite conclusion—just as the dissenting ATJ in this case did. *See Dissent* at *28. The prior Board decision found that the "COGNAC certification mark has achieved major commercial success in the United States when used in association with brandy and, therefore, the COGNAC certification mark *would fall on the very strong end of the spectrum of fame* for purposes of the likelihood of confusion analysis" and that the fame *DuPont* factor therefore "weigh[ed] heavily in favor of finding a likelihood of confusion." *Bureau Nat'l Interprofessionnel du Cognac v. Enovation Brands, Inc.*, 2020 WL 1528535 at *6 (T.T.A.B. 2020) (emphasis added). The Board in this case did not attempt to distinguish that prior decision or otherwise address it.

We leave it to the Board on remand, under the above-stated legal standard, to determine the extent of the fame of COGNAC and thus to what scope of protection it is entitled. Because fame is the "dominant" factor in a likelihood of confusion analysis and affects the overall strength and level of protection of the mark, on remand the Board should reconsider *all* of the *DuPont* factors for which there is argument and evidence of record.

## B. SIMILARITY OF MARKS

We next consider the first *DuPont* factor. It deals with the similarity or dissimilarity of the marks in their entireties, considering their appearance, sound, connotation, and commercial impression. *DuPont*, 476 F.2d at 1361. However, it may be appropriate, in certain circumstances, to consider that, "one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1368 (Fed.

Cir. 2012) (quoting *Leading Jewelers Guild, Inc. v. LJOW Holdings, LLC*, 82 U.S.P.Q.2d (BNA) 1901, 1905 (T.T.A.B. 2007)); *see also In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) ("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties."). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs.*, 668 F.3d at 1368 (quoting *Leading Jewelers Guild*, 82 U.S.P.Q.2d at 1905). When one mark incorporates the entirety of another mark, it has been found to be similar. *See, e.g., Coca-Cola Bottling Co. of Memphis, Inc. v. Joseph E. Seagram & Sons, Inc.*, 526 F.2d 556 (CCPA 1975); *TiVo Brands LLC v. Tivoli, LLC*, 129 U.S.P.Q.2d (BNA) 1097, 1115 (T.T.A.B. 2018).

As the Board acknowledged, the Applicant's mark "incorporates the term COGNAC" in its entirety. *Decision* at *11. Further, it found that "COLOGNE & COGNAC is the dominant element," which "appears prominently above the smaller and merely descriptive or generic term ENTERTAINMENT." *Id.*; *see also id.* at *1 (noting that "Entertainment" was disclaimed). However, the Board found that the marks were not similar because Applicant's mark "engenders a different appearance, sound, commercial impression and connotation" from the certification mark. *Decision* at *11. But the Board's explanation for that conclusion fails to provide the necessary support.

The Board's primary rationale for its finding that the marks are dissimilar was that COGNAC "informs consumers that the brandy being sold by the certified users comes from the Cognac region of France" whereas the Applicant's mark "projects an image of sophistication and elegance." *Id.* To the extent that the Board reached its conclusion that the connotations of the marks are different because

Opposers' mark is a certification mark, we find that to be
legal error.  As the dissent points out:

> There is nothing in the language of Section 2(d)
> which mandates or warrants application of one
> level of likelihood of confusion analysis (*i.e.*, the
> *duPont* analysis) in cases where the plaintiff's
> mark is a trademark or service mark, but a differ-
> ent and more limited likelihood of confusion analy-
> sis in cases where the plaintiff's mark is a
> certification mark.  Section 2(d) does not distin-
> guish between certification marks, on the one
> hand, and trademarks and service marks on the
> other.

*Dissent* at \*20; *see also Brown-Forman*, 47 U.S.P.Q.2d
(BNA) at 1891 (rejecting an applicant's argument that
COGNAC "is entitled to a more narrow scope of protection
merely because it is a certification mark rather than a
trademark").  Simply because COGNAC "informs consum-
ers that the brandy being sold by the certified users comes
from the Cognac region of France," it does not mean that it
cannot also "project an image of sophistication and ele-
gance."  For example, just because the use of the FLORIDA
certification mark for oranges may inform a consumer that
the fruit product originates in Florida, it does not mean
that it cannot engender other qualities, such as freshness
or juiciness.  For the Board to have limited COGNAC's
"connotation" to its certification function was error.

More importantly, the record shows that Applicant's
mark "projects an image of sophistication and elegance"
precisely *because* of its use of COGNAC.  Indeed, the Board
acknowledged that "the combination of terms 'cologne' with
'Cognac' creates an image of a person wearing cologne and
drinking brandy, projecting a certain lifestyle, such as one
of leisure and high-living." *Decision* at \*11.  And the Board
found that COGNAC "is perceived as having a reputation
for being a drink for an older or affluent clientele," *id.* at 11
n.38 (citing record evidence), but it made no such findings
concerning the connotations of "cologne."   The dissent

points out that discrepancy, explaining that none of the record evidence "associate[s] the term 'cologne' with affluence, refinement, or the upper class. Indeed, to the extent Applicant's mark evokes a lifestyle of leisure or high living, the materials show that it is the term COGNAC alone that projects this image." *Dissent* at *19 n.56; *see also id.* at *18 ("The meaning of Opposers' mark has been incorporated into Applicant's COLOGNE & COGNAC mark. For consumers of Applicant's goods or services, the term COGNAC projects the identical meaning in Applicant's mark as in Opposers' mark . . . ."). Yet, despite the majority's factual findings, the Board concluded that the "connotation and commercial impression of Applicant's mark differs significantly from the meaning attributed to Opposers' certification mark." *Decision* at *11. Such conclusion that the marks have different connotations is contradicted by the record evidence and by the Board's own findings that COGNAC is associated with affluent and upper-class consumers. It is therefore not supported by substantial evidence. *See Honeywell*, 865 F.3d at 1354; *Linear Tech.*, 566 F.3d at 1064.

We do not decide the ultimate issue of whether or not the marks engender a different appearance, sound, or commercial impression such that they are dissimilar, *DuPont*, 476 F.2d at 1361; we leave the Board to consider that on remand.

### C. RELATEDNESS OF GOODS, TRADE CHANNELS, AND CONSUMERS

The Board addressed the second and third *DuPont* factors together, which consider the "similarity or dissimilarity and nature of the goods or services" and the "similarity or dissimilarity of established, likely-to-continue trade channels." *DuPont*, 476 F.2d at 1361. Although the record evidence for each of those factors may overlap, that does not dictate the same conclusion for each. However, like the Board, we discuss the two in tandem.

We question the Board's declaration that certain record evidence is not "relevant" or "probative" to those factors. For example, the Board acknowledged that other entities had attempted "to adopt the same mark for musical recordings or entertainment services, *e.g.*, SINATRA, MOTORHEAD, AC/DC, etc., and alcoholic beverages," but then concluded that it was "unclear how this type of evidence is relevant." *Decision* at \*13. The Board likewise dismissed Opposers' evidence that "COGNAC certified product has an intimate and legendary history with music, particularly rap and hip-hop music, in the United States," including the use of authorized COGNAC products in song titles and song lyrics, and in partnerships between hip-hop artists and certified COGNAC brands. *Id.* at \*12–13. We do not opine on the exact weight that that evidence should be given, but find that it was error for the Board to discount that evidence completely; it is undoubtedly relevant to the relatedness of goods, services, and trade channels.

The Board's failure to consider that evidence seems to stem from an erroneous comparison between the *Opposers'* services of certifying and *Applicant's* goods, services, and trade channels. Rather, the proper comparison is between the goods, services, and trade channels of *certified users* of the COGNAC mark (*e.g.*, HENNESSEY) to *Applicant's* goods, services, and trade channels.[4] Applicant claims that the Board merely made a "typo" in that section of its analysis, Applicant's Br. at 28, but the repeated references to Opposers in the Board's decision make that argument unpersuasive. The Board explained that consumers will not believe that "*Opposers* are affiliated with any of

---

[4]    The Board explained that "[b]ecause Opposers' mark is a regional certification mark, . . . it is not used by its owners, 15 U.S.C. § 1127, but is instead used by authorized users," and its analysis was therefore "based on the authorized users' goods." *Decision* at \*12. But that assertion carries little weight when the Board goes on to repeatedly refer to *Opposers'* activities. *Id.* at \*12–13.

[Applicant's] goods or services," that "*Opposers* have now ventured into the business of sponsoring or authorizing production of recordings or recording services or the other goods or services of Applicant," and that "either *Opposer* provides musical sound recordings or any services related to the music industry." *Id*. at \*12–13 (emphases added). That incorrect comparison was legal error.

The Board also appears to have improperly discounted evidence of partnerships between hip-hop artists and certified COGNAC products because the artists also developed a brand or house name for their own products. *See id*. at \*13. But as with our discussion of fame, *supra* Sec. I.A, and for similar reasons, the use of a brand name on a product does not necessarily negate the use of the certification mark on the same product. *See Dissent* at \*20. The record shows that at least five well-known hip-hop artists have produced a certified COGNAC product. *Decision* at \*13; *see also Dissent* at \*22–24 (highlighting other evidence of connections between the hip-hop industry and COGNAC). That they have done so under a personal brand does not negate their undisputed relationship with certified COGNAC products.

Moreover, the Board failed to acknowledge admissions by Applicant that were contrary to its conclusion. As the dissent pointed out, *Dissent* at \*22, Applicant admitted that "the association between cognac and the music industry is commonplace" and that there is "prolific use of the term 'cognac' or brands of cognac in song lyrics, song titles, etc.," J.A. 1063—facts that the majority did not substantively address. And at oral argument, Applicant's counsel once again reiterated that the record shows that "the COGNAC houses," such as REMY and MARTEL, "are engaging with the hip-hop industry," Oral Arg. at 30:13–23, and that "there are some players, there are some celebrities who are involved with [the COGNAC industry]," *id*. at 31:52–32:14. Indeed, Applicant's counsel ultimately acknowledged that "there is an association" between the hip-hop industry and COGNAC. *Id*. at 33:37–42. Those

admissions are not determinative of *DuPont* factors two and/or three, but the Board should consider them on remand.

As with similarity of the marks, we do not decide the ultimate issue of whether or not there is a similarity between the nature of the goods, services, and/or established, likely-to-continue trade channels, *DuPont*, 476 F.2d at 1361, and leave the Board to consider that on remand.

\* \* \*

In sum, we vacate the Board's holding of no likelihood of confusion and remand for reconsideration of that issue in light of this opinion.

## II. DILUTION

When reviewing a lower tribunal's dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) for insufficiency of the pleadings, we do so *de novo*, accepting all well-pleaded factual allegations in the complaint as true and construing the pleadings in the light most favorable to the plaintiff.[5] *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1306 n.3 (Fed. Cir. 2020); *Young v. AGB Corp.*, 152 F.3d 1377, 1379 (Fed. Cir. 1998); TMBP § 503.02. Rule 8(a)(2) "generally requires only a plausible 'short and plain' statement of the plaintiff's claim," showing that the plaintiff is entitled to relief. *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). To survive dismissal under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A

---

[5]    In an opposition proceeding before the Board, the opposer is considered the plaintiff and the applicant is considered the defendant. 37 C.F.R. § 2.116(b). Likewise, the Notice of Opposition is considered the complaint, and its sufficiency is determined in accordance with the Federal Rules of Civil Procedure. 37 C.F.R. §§ 2.116(a), (c).

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In order to prevail on a dilution by blurring claim, a plaintiff (in this case, Opposers) must ultimately prove that:

> (1) plaintiff owns a famous mark that is distinctive;
>
> (2) the defendant is using a mark in commerce that allegedly dilutes the plaintiff's famous mark;
>
> (3) the defendant's use of its mark began after the plaintiff's mark became famous; and
>
> (4) the defendant's use of its mark is likely to cause dilution by blurring.

*Coach Servs. Inc.*, 668 F.3d at 1372; *see also* 15 U.S.C. §§ 1063, 1125(c).

The Board first found that Applicant had waived its affirmative defense that Opposers had failed to state a claim. *See Decision* at *2 n.4 ("The assertion that Opposers failed to state a claim is considered waived because Applicant did not file a formal motion to dismiss or raise the issue at trial."). However, despite that finding of waiver, the Board *sua sponte* found that Opposers specifically failed to plead the third element of dilution: "that their mark became famous *prior to* any actual or constructive use by Applicant." *Id.* at *15. The critical issue for the Board was that, although Opposers pleaded that COGNAC is famous, they did not make clear that that fame was prior to Applicant's constructive use date. *Id.* The Board likewise found that dilution had not been tried by implied consent for substantially the same reason. *Id.* at *16.

Opposers argue that their claim for dilution by blurring should not have been dismissed because (1) as the Board found, Applicant waived its assertion that Opposers failed to state a claim; (2) the Board applied erroneous,

heightened pleading standards; (3) Opposers' complaint, regardless, sufficiently pleaded that COGNAC was famous prior to Applicant's constructive date; and (4) the Board erred in finding the claim was not tried by implied consent.

We conclude that, under the correct pleading standard, Opposers sufficiently pleaded their dilution claim. The purpose of the complaint is to put the respondent on notice of what the complainant intends to argue. *See Twombly*, 550 U.S. at 555 ("Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (internal quotations omitted)); *ABB Turbo Sys. AG v. TurboUSA, Inc.*, 774 F.3d 979, 984 (Fed. Cir. 2014) ("Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6) together establish a notice-pleading standard . . . ."); *O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006) ("[T]he Federal Rules require only notice pleading by the claimant.").

Here, the Notice of Opposition provided sufficient notice to meet the pleading standards of Rule 8. Opposers clearly asserted that they intended to argue dilution through blurring in violation of 15 U.S.C. § 1125(c). J.A. 72. Although Opposers did not specify a date on which their mark became famous or a date by which it was famous, it was clear from the Notice, and from the nature of the claim, that Opposers intended to argue that their certification mark was famous prior to Applicant's constructive date of first use.

Opposers consistently and throughout their Notice refer to their mark as "famous." *See, e.g.*, J.A. 71 ("COGNAC is a famous designation for brandy . . . ."); J.A. 72 ("the famous COGNAC mark"). Moreover, their Notice of Opposition, filed on August 28, 2019, pleaded that COGNAC had become well-known "over many years," J.A. 71–72, which was necessarily before Applicant's constructive use date only five months earlier, on March 7, 2019. *Decision* at *4 ("Applicant may rely on its application filing date of March

7, 2019 as its constructive date of first use."). Although not a model of clarity, when read in a light most favorable to Opposers, such statement could be reasonably interpreted to mean that COGNAC has been famous for many years—necessarily before Applicant's constructive use date only a few months prior. Opposers need not have specified a particular date by which their mark became famous; such is not necessary to prove a claim of dilution. Rather, it was sufficient to simply give notice that the mark was famous at some point prior to the junior mark's constructive use date.

Because we find that Opposers' dilution claim was sufficiently pleaded, we need not reach the questions of whether it was tried by implied consent or whether the Board properly dismissed the claim *sua sponte* despite waiver.

The Board also found that, had the issue been properly pleaded or tried by implied consent, Opposers had still not proven the fame element of their claim. *Decision* at \*16. But that conclusion rested on the majority's finding that the mark was not famous in its likelihood of confusion analysis, since fame for purposes of dilution requires a higher standard than that for likelihood of confusion. *See id.* at \*16 n.54 (citing *Coach Servs.*, 668 F.3d at 1373). Because we vacate the Board's finding that COGNAC is not famous for purposes of likelihood of confusion, *supra* Sec. I.A, we likewise vacate the Board's finding that COGNAC is not famous for purposes of dilution. We remand for consideration of that issue on the merits.

## CONCLUSION

We have considered both parties' remaining arguments but find them unpersuasive. For the foregoing reasons, the decision of the Board is vacated and remanded.

## VACATED AND REMANDED

## COSTS

Costs to Appellants.